**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

BKY No. 21-41171
ADV No. 22-____

In re:

Natalia Nevin,

    Debtors.

---

Randall L. Seaver, Trustee,

    Plaintiff,

vs.

Kevin Mark Nevin,

    Defendant.

**COMPLAINT**

---

Randall L. Seaver, trustee ("Trustee") of the bankruptcy estate of Natalia Nevin ("Debtor"), as and for his Complaint against Kevin Mark Nevin ("Defendant"), states and alleges as follows:

## I.     JURISDICTION AND VENUE

1. This bankruptcy case was commenced on June 29, 2021 by the filing of a voluntary Chapter 7 petition (the "Petition Date").

2. This is an action to avoid and recover the pre-petition transfers of property of the debtor Natalia Nevin to the Defendant pursuant to 11 U.S.C. §§ 548, 550 and 551.

3. This is also an action for declaratory judgment pursuant to Bankruptcy Rule 7001(9) and 28 U.S.C. § 2201.

4. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2) and 1334.

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

6. Plaintiff consents to entry of final orders or judgment by this Court.

## II.   PARTIES

7. Plaintiff is the duly appointed Chapter 7 Trustee of the bankruptcy estate of the Debtors.

8. Defendant Kevin Nevin is an individual residing in the state of Minnesota.

9. Defendant Kevin Nevin is the father of the Debtor Natalia Nevin.

## III.   FACTUAL BACKGOUND

### A.   Smartlife Earnings

10. On May 8, 2019, the Debtor executed an employment agreement with Smartlife Financial Group, LLC ("Smartlife") to be engaged as an investment advisor representative of Smartlife (hereinafter the "Smartlife Agreement").

11. A true and correct copy of the Smartlife Agreement is attached hereto as **Exhibit A**.

12. The Smartlife Agreement provided for payments to Natalia Nevin as an independent contractor for service provided pursuant to the terms of the Smarlife Agreement.

13. Payments to Natalia Nevin under the Smartlife Agreement were subject to the following conditions:

   i. No compensation shall be paid to you after the lapse, suspension or revocation of any license(s) needed by you to perform your duties pursuant to this agreement.

   ii. Any compensation owed to you may not be assigned by you without the written consent of Smartlife and any attempted, non-approved assignment shall be null and void.

Exhibit A at ¶ 3c.

14. Pursuant to the Smartlife Agreement, Smartlife transferred, at a minimum, the following compensation to the Debtor:

|    | Date of Deposit     | Compensation ($) |
|----|---------------------|------------------|
| a. | August 16, 2019     | $2,417.73        |
| b. | September 16, 2019  | $6,158.08        |
| c. | October 16, 2019    | $7,137.26        |
| d. | November 18, 2019   | $8,329.69        |
| e. | December 13, 2019   | $8,472.65        |
| f. | January 16, 2020    | $8,862.85        |
| g. | February 14, 2020   | $9,360.67        |
| h. | March 16, 2020      | $9,100.66        |
| i. | April 15, 2020      | $8,566.52        |
| j. | May, 15, 2020       | $8,412.91        |
| k. | June 16, 2020       | $9,056.59        |
| l. | July 15, 2020       | $9,123.44        |
| m. | August 14, 2020     | $9,586.25        |
| n. | September 15, 2020  | $8,694.02        |
| o. | October 15, 2020    | $8,389.29        |
| p. | November 13, 2020   | $7,553.94        |
| q. | December 15, 2020   | $3,394.58        |
|    | TOTAL:              | $132,617.13      |

15.     The Debtor's compensation from Smartlife was deposited into a bank account held in her personal name at U.S. Bank, ending in account number 7775 ("Account 7775").

16.     After deposit of the Debtor's earnings from Smartlife into Account 7775, the Debtor would transfer almost the entire deposit of the Smartlife Earnings to an account held in the name of Financial & Investment Advisors, Inc. located at U.S. Bank and ending in account number 1981 ("Account 1981").

17.     According to the Debtor's bank statements for Account 7775, the following amounts were transferred from Account 7775 to Account 1981:

|    | Date of Transfer   | Amount Transferred |
|----|--------------------|--------------------|
| a. | August 16, 2019    | $5,000.00[1]       |
| b. | September 16, 2019 | $8,000.00          |

---

[1] It appears this deposit was intended to be a transfer of two combined amounts deposited into the Debtor's bank account, one of which was from SmarLife.

| | | |
|---|---|---|
| c. | October 22, 2019 | $6,800.00 |
| d. | November 20, 2019 | $8,000.00 |
| e. | December 16, 2019 | $8,500.00 |
| f. | January 16, 2020 | $8,000.00 |
| g. | February 14, 2020 | $9,000.00 |
| h. | March 17, 2020 | $8,500.00 |
| i. | April 17, 2020 | $8,500.00 |
| j. | May 15, 2020 | $8,300.00 |
| k. | June 16, 2020 | $8,800.00 |
| l. | July 15, 2020 | $8,500.00 |
| m. | August 17, 2020 | $9,500.00 |
| n. | September 16, 2020 | $8,500.00 |
| o. | October 19, 2020 | $8,300.00 |
| p. | November 16, 2020 | $7,600.00 |
| q. | December 16, 2020 | $3,100.00 |
| | **TOTAL:** | **$ 132,900.00** |

Hereinafter collectively referred to as the "Smartlife Earnings Transfers".

18.     According to the records filed with the Minnesota Secretary of State, the Defendant is the chief executive officer and registered agent for Financial & Investment Advisors, Inc.

19.     The Debtor's Schedule B filed with her petition discloses no ownership interest in Financial & Investment Advisors, Inc.

20.     On information and belief, the Defendant is the sole owner of Financial & Investment Advisors, Inc.

21.     After transfer of the Smartlife Earnings into Account 1981, Kevin Nevin treated the monies as his own and utilized the funds for his own benefit.

**B.     CorePath Asset Sale Agreement**

22.     In or around September, 2020, the Debtor executed a document titled "Asset Purchase Agreement" with an effective date of September 29, 2020.

23. In conjunction with the asset purchase agreement with effective date September 29, 2020, Natalia Nevin and Kevin Nevin also executed a compensation agreement (hereinafter the compensation agreement and asset purchase agreement shall be collectively referred to as the "Asset Purchase Agreement").

24. Pursuant to the terms of the Asset Purchase Agreement, CorePath agreed to purchase, as buyer, all of Natalia Nevin and Kevin Nevin's interests in certain client accounts (hereinafter the "CorePath Transfer").

25. The Asset Purchase Agreement treats Natalia Nevin and Kevin Nevin as if they are joint sellers under the agreement.

26. According to a September 1, 2020 email correspondence from an agent of CorePath, it appeared to be CorePath's conclusion that Kevin Nevin was not "formally affiliated" with any of the accounts that were being purchased through the Asset Purchase Agreement.

27. The September 1, 2020 email from the agent of CorePath also suggests to Kevin Nevin and Natalia Nevin that the then draft agreement be altered in light of the conclusion that Natalia Nevin was the investment advisor representative for the subject accounts, stating: "rather than an asset purchase agreement with Kevin, this is looking like a solicitor agreement with Natalie [*sic*]".

28. According to records provided by CorePath to the Plaintiff, since the execution of the Asset Purchase Agreement, CorePath has distributed $79,704.64 to Kevin Nevin pursuant to the terms of the Asset Purchase Agreement ("CorePath Distributions").

29. On information and belief, Natalia Nevin has not received any consideration from the CorePath Transfer, including the CorePath Distributions.

30. On information and belief, CorePath is obligated under the terms of the Asset Purchase Agreement to disburse up to four additional payments to Kevin Nevin and Natalia Nevin on account of the CorePath Transfer.

31. On information and belief, CorePath is currently holding funds in the amount of $13,852.19, which are payable to Kevin Nevin and Natalia Nevin pursuant to the terms of the Asset Purchase Agreement.

    C.    **Debtor's Financial Affairs**

32. According to the summary of assets and liabilities filed with the Debtor's verified petition, she estimated the total value of her assets as of the petition date as $91,961.35.

33. According to the summary of assets and liabilities filed with the Debtor's verified petition, the total amount of the Debtor's liabilities as of the petition date was $2,268,781.32.

34. According to the Debtor's original schedules filed with her petition on June 29, 2021, the only non-exempt asset the Debtor had an interest in as of the petition date was "Amount owing from father (believed to be uncollectible)".  Although referring to it as "uncollectible" the Debtor listed the value of the claim as $60,000.

35. The Debtor's Schedule F, filed with her petition, discloses student loan debt in the amount of $67,500 as of the Petition Date.

36. The initial statement of financial affairs filed by the Debtor did not disclose the Smartlife Earnings Transfers.

37. On January 5, 2022, the Debtor filed an amended statement of financial affairs to include the disclosure of an amount "in excess of $100,000.00" to the Defendant in the two years prior to the filing of her bankruptcy petition from her Smartlife Earnings.

38. The CorePath Transfer has not been disclosed in the Debtor's schedules or statement of financial affairs.

39. On or about October 6, 2020, the Debtor was named as a defendant in a lawsuit filed with the Financial Industry Regulatory Authority and assigned Case No. 20-03436 (the "FINRA Lawsuit").

40. Defendant Kevin Nevin was also listed as a defendant in the FINRA Lawsuit.

41. On or about March 24, 2021, claimants in the FINRA Lawsuit brought a motion for default judgment against the Debtor and other named defendants, seeking in part judgment against the Debtor in the amount of $580,863.00 and judgment against Defendant in the amount of $962,096.00.

42. On information and belief, the March 24, 2021 motion for default judgment in the FINRA Lawsuit was pending as of the Petition Date.

43. On information and belief, judgment in the amount of $956,096.00 was entered against the Defendant in the FINRA Lawsuit on October 5, 2021.

44. According to the financial information on the Debtor's bankruptcy schedules and statement of financial affairs, she was insolvent at the time of the Smartlife Earnings Transfers and CorePath Transfer, or was rendered insolvent as a result of those transfers.

## COUNT 1
### FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(B)
### (CONSTRUCTIVE FRAUD – SMARTLIFE EARNINGS)

45. Plaintiff realleges and reaffirms the foregoing paragraphs of this Complaint.

46. The Smartlife Earnings Transfers occurred within two years of the Petition Date.

47. The Debtor was in contract with Smartlife, and as such was entitled to the benefit of the earnings pursuant to the Smartlife agreement.

48. The Smartlife Earnings Transfers are a transfer of an interest in property of the Debtor, which constitutes a transfer of the Debtor's property pursuant to 11 U.S.C. § 101(54).

49. The Smartlife Earnings Transfers occurred at a time when the Debtor was insolvent, or the Smartlife Earnings Transfers rendered the Debtor insolvent.

50. The Debtor received no value in exchange for the Smartlife Earnings Transfers to the Defendant, or the consideration received was less than reasonably equivalent value.

51. The Defendant's involvement with the FINRA Lawsuit, and underlying claim, provided him knowledge of the Debtor's insolvency, or likelihood of pending insolvency.

52. The Smartlife Earnings Transfers are avoidable as fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B).

53. The Estate is entitled to judgment against Defendant in the amount of $132,900 for the recovery of the avoided transfers pursuant to 11 U.S.C. § 550.

54. The avoided transfers are subject to preservation for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 550.

## COUNT 2
### FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(B)
### (CONSTRUCTIVE FRAUD – COREPATH DISTRIBUTIONS)

55. Plaintiff realleges and reaffirms the foregoing paragraphs of this Complaint.

56. The CorePath Distributions occurred within two years of the Petition Date.

57. The Debtor was the only party with a formal relationship with the accounts being transferred to CorePath in the CorePath transfer.

58. On account of her interest in the accounts transferred, the Debtor was entitled to receipt and benefit of the CorePath Distributions.

59. The CorePath Distributions constitute a transfer of an interest in property of the Debtor, which constitutes a transfer of the Debtor's property pursuant to 11 U.S.C. § 101(54).

60. The CorePath Distributions occurred at a time when the Debtor was insolvent, or the CorePath Distributions rendered the Debtor insolvent.

61. The Debtor received no value in exchange for the CorePath Distributions to the Defendant, or the consideration received was less than reasonably equivalent value.

62. The Defendant's involvement with the FINRA Lawsuit, and underlying claim, provided him knowledge of the Debtor's insolvency, or likelihood of pending insolvency.

63. The CorePath Distributions are avoidable as fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B).

64. The Estate is entitled to judgment against Defendant for the recovery of the avoided transfers pursuant to 11 U.S.C. § 550 in the amount of $79,704.64.

65. The avoided transfers are subject to preservation for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 550.

### COUNT 3
### Declaratory Judgment
### 28 U.S.C. § 2201

66. Plaintiff realleges and reaffirms the foregoing paragraphs of this Complaint.

67. There is a dispute concerning the bankruptcy estate's interest in the remaining proceeds payable to the Debtor pursuant to the Asset Purchase Agreement.

68. The Debtor was the only party with a formal relationship with the accounts transferred in the Asset Purchase Agreement, and as such is entitled to receipt of all remaining payments owed under the Asset Purchase Agreement.

69. There is no written agreement through which the Debtor assigned any rights under the Asset Purchase Agreement to the Defendant.

70. The Debtor's interests in the Asset Purchase Agreement became property of her bankruptcy estate upon the filing of her voluntary petition on June 29, 2021.

71. The Plaintiff, as trustee for the bankruptcy estate of Natalia Nevin, is entitled to receive any and all remaining payments payable from CorePath under the Asset Purchase Agreement, including funds already payable but not yet disbursed.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter its judgment:

1. Pursuant to Count 1, avoiding the Smartlife Earnings Transfers to the Defendant pursuant to 11 U.S.C. § 548(a)(1)(B).

2. Pursuant to Count 2, avoiding the transfer of the CorePath Distributions to the Defendant pursuant to 11 U.S.C. § 548(a)(1)(B).

3. Entering monetary judgment against the Defendant and in favor of the Plaintiff under Count 1 in the amount of $132,900.00 pursuant to 11 U.S.C. § 550.

4. Entering monetary judgment against the Defendant and in favor of the Plaintiff under Count 2 in the amount of $79,704.64 pursuant to 11 U.S.C. § 550.

5. Ordering the preservation of the avoided transfers and judgments for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

6. Declaring that the bankruptcy estate of Natalia Nevin is entitled to receive any and all remaining payments payable from CorePath under the Asset Purchase Agreement, including funds already payable but not yet disbursed.

7. Awarding the Plaintiff his costs and disbursements in this action and any other or further relief as the court deems just and equitable.

**GREENSTEIN SELLERS PLLC**

Dated: April 6, 2022     By:  /e/ Matthew D. Swanson
　　　　　　　　　　　　　　　Matthew D. Swanson          390271
　　　　　　　　　　　　　　　Greenstein Sellers PLLC
　　　　　　　　　　　　　　　825 Nicollet Mall, Suite 1648
　　　　　　　　　　　　　　　Minneapolis, MN 55402
　　　　　　　　　　　　　　　mswanson@greensteinsellers.com


Attorneys for Plaintiff Randall L. Seaver, Trustee

**SmartLife Financial Group LLC**
**601 21st Street**
**Suite 318**
**Vero Beach, Florida 32960**

Natalia Rose Nevin                                                                                                    April 22, 2019
817 W 57th Street
Minneapolis, MN 55419

**Re: Terms of Engagement**

Dear Natalia:

This agreement sets forth the terms of your Engagement with SmartLife Financial Group, LLC ("SmartLife").

1. Position and Duties; "At Will" Basis.
    a. Commencing on the date hereof, you shall be engaged as an Investment Adviser Representative of SmartLife on an "at will" basis. In your capacity as an Investment Adviser Representative of SmartLife, you shall diligently and to the best of your ability perform all the duties that such position entails.

2. Your initial duties as an Investment Adviser Representative will be to market the advisory services of SmartLife, implement investment advice pursuant to the strategies agreed by SmartLife, and to follow the written policies and procedures of SmartLife. Insurance business activity must be processed through Fortress Brokerage Solutions.

3. Compensation.
    a. *Salary, benefits, etc.* There will be no salary or other benefits provided by SmartLife. You will operate on a 1099 basis.
    b. *Independent Contractor Compensation.* See Schedule A.
    c. *Other Compensation Terms and Conditions.* You hereby agree that the compensation payable by SmartLife to you pursuant to this agreement shall be subject to the following additional terms and conditions:
        i. No compensation shall be paid to you after the lapse, suspension or revocation of any license(s) needed by you to perform your duties pursuant to this agreement.
        ii. Any compensation owed to you may not be assigned by you without the written consent of SmartLife and any attempted, non-approved assignment shall be null and void.
        iii. SmartLife is entitled to chargeback to you, and you agree to pay to SmartLife, all payments made to you pursuant to Section 2(b) hereof that are attributable to Gross Revenues that are subsequently reclaimed by and/or refunded to a customer of SmartLife, whether such customer had a contractual right to such refund.

EXHIBIT A

*4.Conflicting Employment; Business Opportunities; Outside Business Activity:* You shall devote that amount of time, attention, knowledge, and skills to the business and interest of SmartLife, which shall be necessary to responsibly perform and discharge your duties under this Agreement. You may engage in any other trade or business provided that in advance of engaging in such trade or business, the outside business activity is disclosed in writing to and approved by SmartLife's Chief Compliance Officer for the purpose of compliance monitoring and inclusion in the firm's ADV. An undisclosed or unapproved outside business activity could result in termination for cause of this Agreement by SmartLife. Under no circumstances are you or any entity owned or controlled by you to borrow funds from a client of SmartLife or engage in any business or other activity with a client of SmartLife that may constitute a private securities transaction away from SmartLife without the prior written consent of SmartLife. For purposes of this Agreement "outside business activity" shall mean involvement in any entity whether compensation is received or not.

5.Compliance with Laws, Policies and Procedures. You understand and agree that your activities during the term of your engagement with SmartLife shall in all respects comply with applicable federal and state securities and other laws, rules and regulations, any applicable laws of foreign jurisdictions, and the firm policies and procedures that have been adopted (or that may in the future be adopted) by SmartLife (the "Firm Policies"), as each may be amended from time to time. You acknowledge your receipt, review in full, and understanding, of the Firm Policies; it is acknowledged that, if any terms of this letter conflict with the Firm Policies, then the terms of this letter shall govern. You represent and warrant that you currently possess all qualifications, registrations and licenses required for your provision of the services contemplated by this letter, and will maintain any and all qualifications, registrations and licenses required pursuant to applicable laws, rules and regulations. You understand and agree that you shall not engage in any activities as a registered person of an investment adviser, other than SmartLife, or as a registered representative of any broker-dealer without SmartLife's prior written permission.

6.Termination. Your engagement with SmartLife will be on an "at will" basis. You, or SmartLife, may terminate your engagement at any time for any reason with or without cause, with or without notice, without further obligation or liability.

7.Arbitration of Disputes and Litigation. Each of the parties hereto agree to comply with all provisions of the American Arbitration Association ("AAA") Code of Arbitration Procedure, as it may be amended from time to time, as to both customer claims and disputes between SmartLife and you arising out of or in connection with this letter and judgment upon the award may be entered in any court having jurisdiction. Reasonable expenses, attorneys' fees and costs incurred shall be paid in accordance with the award of the arbitrator(s). You agree that any dispute, claim or controversy that may arise between you and SmartLife (including, without limitation, claims alleging employment discrimination or sexual harassment, in violation of a statute or otherwise) will, unless agreed by SmartLife, be arbitrated under the applicable rules and regulations of the AAA. In the event of such a proceeding, all the expenses and damages shall be borne by the parties in accordance with any settlement between or among the parties or judgment rendered in the action.

8.Entire Agreement. This agreement constitutes the sole and entire agreement between the parties concerning your engagement with SmartLife, and supersedes any and all other agreements between us, whether oral or written, implied or expressed.

9.Amendment; Waiver. This agreement may be amended only by an instrument in writing signed by the parties hereto, and any provision hereof may be waived only by an instrument in writing signed by the party or parties against whom or which enforcement of such waiver is sought. The failure of either party hereto at any time to require the performance by the other party hereto of any provision hereof shall in no way affect the full right to require such performance at any time thereafter, nor shall the waiver by either party hereto of a breach of any provision hereof be taken or held to be a waiver

EXHIBIT A

of any succeeding breach of such provision or waiver of the provision itself or a waiver of any other provision of this letter.

10. No Assignment. This agreement is binding on and is for the benefit of the parties hereto and their respective successors, heirs, executors, administrators and other legal representatives. Neither this letter nor any right or obligation hereunder may be assigned by SmartLife (except to an affiliate of SmartLife) or by you.

11. No Restrictions; No Violation; Accuracy of Information Provided. You represent and warrant that: (i) you are not party to any agreement which would restrict or prohibit you from entering into this agreement or performing fully your obligations hereunder; (ii) the execution by you of this agreement and the performance by you of your obligations and duties pursuant to this letter will not result in any breach of any other agreement to which you are a party; (iii) all of the information provided by you to SmartLife, whether in writing or through SmartLife's interview process or otherwise, is true in all respects.

12. Severability. In the event that any provision of this agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, the remaining provisions of this agreement shall continue in full force and effect.

13. Miscellaneous. This agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Paragraphs headings used in this agreement have been inserted for convenience of reference only and shall neither constitute part of this letter nor affect its meaning, construction or effect. This agreement shall be construed, applied, and interpreted in accordance with the laws of the Commonwealth of Virginia, without reference to its conflicts or choice of law principles.

***

If the foregoing is acceptable to you, please sign and return to SmartLife the enclosed copy of this agreement, whereupon it will be a valid and binding agreement between us as of the date set forth on the first page hereof.

Sincerely,

Kenneth M. Ackerman
Chief Operating Officer

ACCEPTED AND AGREED:

_____          5/8/19
Natalia Rose Nevin                 Date    _____

EXHIBIT A

## Schedule A

### Investment Advisory Representative
### Fee sharing and related fees

Advisory fee split:

IAR Payout:       90 % of fee in fee-based accounts after 3rd party fees

RIA retention:    10 % of fee in fee-based accounts after 3rd party fees

Errors and Omission insurance: $175 per month (If not covered at broker-dealer)

Technology fee; $35 per month per user (Includes Office 365: Email and office software)

Administration fee (Operations, Compliance) $10 per month per adviser/email user

Licensing registrations, Initial and Renewals: Pass through actual fees

Regulatory fees: Pass through when charged

Redtail CRM: (Optional software): $25 per user

Money Guide Pro: (Optional Service) No subscription fee, processing fee charged by Claraphi depending on complexity of project

Trading platform if utilized: $100 per month

State Insurance licenses must be individually obtained and paid by adviser

4

EXHIBIT A

## Schedule B

### Commission rates on Insurance/Annuity products

Adviser will be paid directly unless dually registered at a broker dealer, on all insurance products at max street rate except for the following:

If an adviser is registered with a broker dealer, some insurance products such as Indexed Products may run through the broker dealer compensation grid. In Premium financing, distribution solutions, defined benefit, concentrated/restricted stock solutions, non-qualified deferred comp, some renewals, or other advanced concept, Fortress Brokerage Solutions/SmartLife Financial Group will be an agent on the case for a % of target premium. When engaging third party program partners, Fortress Brokerage Solutions/SmartLife may also be on the case for a % - this includes but is not limited to monolith, premium finance, defined benefit, distribution solution, concentrated/restricted position, non-qualified comp. The additional split will depend on the requirements of the third party for the ability to orchestrate and maintain these transactions over the life of the contract.

5

EXHIBIT A